IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:25CR186 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER JR. |
| | ) | |
| v. | ) | |
| | ) | |
| JUAN TIUL XI, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Defendant encouraged and induced a then-fourteen-year-old unaccompanied child (UAC-1)[1] to leave her family and make a dangerous journey from Guatemala to the United States. Defendant directed the minor to pose as his sister (Minor-1) so that he could deceive the Department of Health and Human Services (HHS) Office of Refugee Resettlement's (ORR) UAC Program into placing UAC-1 in Defendant's custody and care.  ORR relied on Defendant's false statements and released UAC-1.  After her release to Defendant who was then twenty-four years old, Defendant repeatedly sexually assaulted UAC-1, which later resulted in his conviction on two counts of sexual battery in Cuyahoga County, Ohio.  On December 18, 2025, pursuant to a stipulated agreement, Defendant pleaded guilty to smuggling-related charges for encouraging and inducing UAC-1 to enter the United States illegally for the purpose of financial gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) and (B)(i) and 18 U.S.C. § 2, and material false

---

[1] Unaccompanied Alien Children (UACs) are defined pursuant to 6 U.S.C. § 279(g)(2) as individuals who have no lawful immigration status in the United States, are under 18 years of age, and have no parent or legal guardian in the United States or no parent or legal guardian in the United States is available to provide care and physical custody.

statements and aggravated identity theft related to the sponsorship of UAC-1, in violation of 18 U.S.C. §§ 1001(a)(2) and 1028A(a)(1), respectively.

Defendant's conduct placed a vulnerable child at risk and undermined the government's efforts to administer the UAC Program and protect children.  His crimes require significant punishment to reflect the serious nature of the offenses, address the personal characteristics of Defendant, and provide ample deterrence to Defendant and others in the same position.  The government recommends a sentence of 21 months' incarceration for encouraging and inducing and false statement violations, which falls within the applicable sentencing guideline range of 15 to 21 months associated with a Criminal History Category II and base level offense of 13 after a three-level reduction for acceptance of responsibility; along with a mandatory consecutive sentence of two years' incarceration for the aggravated identity theft violation pursuant to 18 U.S.C. § 1028A(a)(1). A total sentence of 45 months' incarceration is sufficient but not greater than necessary to meet all of the 18 U.S.C. § 3553(a) factors in this case.

I.      **DEFENDANT'S OFFENSE CONDUCT**

A.      DEFENDANT ENCOURAGED AND INDUCED UAC-1 TO ILLEGALLY ENTER THE U.S., WHICH PLACED HER AT RISK AND CAUSED FINANCIAL HARM TO UAC-1'S FAMILY.

In or around June 2023, Defendant communicated with UAC-1 through social media and agreed to help UAC-1 enter the United States illegally.  UAC-1 crossed the Rio Grande by raft and was apprehended by U.S. Border Patrol near the United States-Mexico border.  According to UAC-1, she was guided from Guatemala to the United States by Defendant's friend whom she referred to as a "coyote."  The term "coyote" colloquially refers to a human smuggler operating in Latin and/or Central America.

By encouraging and inducing UAC-1 to journey from Guatemala to the United States, Defendant exposed UAC-1 to the risks many aliens, including vulnerable children, face when

they travel across Central America to the United States.  UAC-1, a minor only fourteen-years-old at the time, was not traveling with family or others known to her.  Defendant nonetheless encouraged and induced UAC-1 to leave her family and the only country she knew, to undertake a dangerous journey, and to illegally enter the United States.

UAC-1's family financed her journey by securing a debt against a family home. Defendant admitted connecting UAC-1's family with a lender.  UAC-1 asserted to law enforcement that she intended to help pay down the debt by working in the United States. Defendant has admitted that he encouraged and induced UAC-1 to enter the United States illegally and aided and abetted other persons in doing so for the purpose of financial gain.[2] UAC-1 noted that if her family did not pay Defendant and her coyote, UAC-1's family would lose the home they put up as collateral for her journey.  UAC-1 asserted to an ORR National Call Center staff member that Defendant threatened to cause UAC-1's deportation or return her to ORR custody if UAC-1 did not pay her debt.

By encouraging and inducing UAC-1's illegal entry for financial gain, Defendant saddled UAC-1 and her family with a substantial financial burden, one that jeopardized her family's financial security and a family home.  From his own personal experience of entering the United States illegally and working to pay off a smuggling debt, Defendant knew that such burdens could take years of hard work for a grown man such as himself to pay down and likely knew that

---

[2] Private financial gain can be demonstrated "merely by proving that a principal—not necessarily the defendant himself—committed the crime with a pecuniary motive." *United States v. Tsai*, 282 F.3d 690, 697 (9th Cir. 2002); *see also United States v. Gaspar-Felipe*, 4 F.4th 330, 342 (5th Cir. 2021) (finding sufficient evidence on the transportation counts in testimony that the illegal aliens paid or would pay someone else in Gaspar-Felipe's operation); *see also United States v. Kim*, 435 F.3d 182, 185–86 (2d Cir. 2006) (determining the evidence was sufficient to prove financial gain, which included that smuggling network leader introduced the aliens to the defendant, that others involved in the network received or expected to receive payment, and that one alien had paid the network leader and owed another for smuggling).

it would take a minor without work authorization such as UAC-1 even longer.

A significant term of imprisonment is necessary to reflect the serious nature and circumstances of Defendant's conduct and deter similar conduct by Defendant and others.

B. <u>DEFENDANT CAUSED HARM TO THE GOVERNMENT BY USING ITS UAC PROGRAM AS A METHOD AND MEANS TO ENCOURAGE AND INDUCE UAC-1 TO ENTER THE UNITED STATES ILLEGALLY AND BY SUBMITTING FALSE STATEMENTS AND COMMITTING IDENTITY THEFT.</u>

Defendant encouraged and induced UAC-1 to enter the country illegally. In order to accomplish this scheme, he arranged for UAC-1 to use his sister's identity to enter the United States and be placed in ORR custody so that he could ultimately sponsor UAC-1 by fraudulent means.

1. <u>ORR's UAC Program</u>

After UACs are apprehended in the United States, Department of Homeland Security (DHS) immigration officials or another federal agency generally transfers them to the UAC Program, which is administered by ORR. HHS is, by law, responsible for the custody and care of UACs unless and until ORR can place the UAC with a suitable sponsor while the UACs await immigration proceedings. The process of releasing a UAC from ORR custody to a sponsor involves several steps, including, but not limited to, the identification of sponsors, the submission of a sponsor application, and an assessment of sponsor suitability, which includes verification of the sponsor's identity and relationship, if any, to the child.

ORR's job is an important one: to comply with Congress' directive to ensure the safety and suitability of all potential sponsors. "(ORR) has policies and procedures in place to ensure unaccompanied children in ORR custody are released in a safe, efficient, and timely manner. . . .

[which] must promote public safety . . . ." Ex. A,[3] at Bates 159. "ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as required by law. ORR also protects children from smugglers, traffickers, or others who might seek to victimize or otherwise engage in criminal, harmful or exploitative activity." *Id.*

ORR prefers placing UACs with sponsors who are parents or immediate family members such as siblings. *Id.* at Bates 160. ORR generally applies less scrutiny[4] in its vetting and requires less supporting documentary material from potential sponsors who purport to be immediate family members and applies a more rigorous review for those sponsors who are less-closely related or not related to UACs. For example, closely related sponsors were only required to submit fingerprints for background checks if other certain indicia of fraud or danger arose, whereas unrelated and less-closely-related sponsors such as Defendant were always required to submit fingerprints for background checks. *Id*. at Bates 178-79. Moreover, an unrelated sponsor must demonstrate a bona fide pre-existing social relationship with the child. *Id.* at 165-66.

ORR relies on potential sponsors to provide complete and accurate information in order to properly assess the sponsors' ability to care for UACs. ORR cannot do its job and protect children when potential sponsors, like Defendant, provide false information to circumvent vetting procedures, which are designed to ensure that *only* suitable sponsors are granted custody

---

[3] Exhibit A is a copy of the policies in place at the time Defendant applied to sponsor UAC-1.
[4] ORR categorizes potential sponsors based on their familial proximity to UACs. Specifically, ORR categorizes parents and guardians as "Category 1;" siblings, grandparents, aunts, uncles, and first cousins as "Category 2A;" other immediate relatives, such as aunts, uncles, or first cousins as "Category 2B;" and distant relatives and unrelated adults as "Category 3." *Id.* ORR's sponsor assessment policies are more deferential to lower-category potential sponsors. For example, internal ORR policy asserts that "ORR *may* deny release to a Category 1 potential sponsor, and *will deny* release to a Category 2A/2B or Category 3 potential sponsor" if indicia of inability to care for a UAC arise. *Id*. at Bates 185-86 (emphasis added). ORR's current policies are publicly available. *See ORR Unaccompanied Alien Children Bureau Policy Guide: Section 2*, Office of Refugee Resettlement (Mar. 13, 2026), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.

of UACs.  Sponsors who provide false information violate the government's trust, jeopardize the UAC Program's integrity, and place children at risk.

> 2.  Defendant's Lies and Abuse of the UAC Program as a Method and Means of Encouraging and Inducing UAC-1 to Enter the United States Illegally

In this case, Defendant submitted to ORR the Spanish-language versions of a Family Reunification Application and an Authorization for Release of Information seeking to sponsor UAC-1.  In the materials, Defendant made multiple materially false statements under the penalty of perjury, including that UAC-1 was Defendant's sister when in fact Defendant and UAC-1 had no familial relation and that UAC-1's name was Minor-1's true name, which is Defendant's real sister.  To support his lies, Defendant caused UAC-1 to provide ORR a copy of the real birth certificate belonging to Minor-1.

Defendant exploited the UAC Program as a method and means to bring UAC-1 to the United States.  Defendant provided UAC-1 with his sister's Guatemalan birth certificate and directed UAC-1 to use the birth certificate to pose as Minor-1 when she entered the United States and to continue using this alias thereafter.  UAC-1 did as Defendant instructed.  Once she entered ORR's custody, Defendant continued the ruse by falsely asserting he and UAC-1 were siblings. ORR predictably relied on Defendant's misrepresentations and released UAC-1 to his custody.

Defendant's lies and use of Minor-1's birth certificate to deceive ORR and gain custody of a minor were serious criminal violations.  Congress created, and ORR administers, the UAC Program to safeguard the health, safety, and wellbeing of children who enter the United States unaccompanied.  The system relies on sponsor applicants to provide truthful and complete information.  By knowingly providing false information and using a government-issued birth certificate that did not belong to UAC-1, Defendant undermined the integrity of this important

6

government program and impeded ORR's ability to ensure children are placed with sponsors who will safeguard their health and well-being.

      C.      <u>DEFENDANT'S ABUSE OF THE UAC PROGRAM FACILITATED FURTHER EXPLOITATION OF A MINOR, UAC-1.</u>

In his application to sponsor UAC-1, Defendant attested that he would "provide for the physical and mental well-being of the child(ren) . . . including . . . protecting the child(ren) from abuse, neglect, and abandonment . . ." (translated).  Defendant did the opposite.  Once UAC-1 was placed in Defendant's custody, he subjected her to repeated sexual battery and other conditions of abuse.  Specifically, according to UAC-1, Defendant was physically violent toward her on at least two occasions, including in an instance when Defendant was drunk.  UAC-1 asserted to ORR that Defendant monitored UAC-1's calls, threatened her with deportation and witchcraft, and demanded payment from her.  Defendant sexually assaulted UAC-1 on multiple occasions while she was in his custody.  UAC-1 asserted that Defendant indicated that he considered sex to be repayment for help in bringing her to the United States.  As if this ordeal were not enough, Defendant's sexual abuse resulted in UAC-1 becoming pregnant, for which Defendant provided medication to UAC-1 in an effort to terminate the pregnancy.

Of course, this Court is not sentencing Defendant for his abuse of UAC-1 after she was released to his custody, which resulted in a conviction on two counts of sexual battery. It is well-established, however, that courts can consider "facts beyond those relating to the crime at issue in the case in fashioning a sentence." *United States v. Britton*, No. 5:13CR127, 2014 WL 6879797, at *3 (N.D. Ohio Dec. 5, 2014) (citing *Nichols v. United States,* 511 U.S. 738, 747 (1994)).  Further, courts may impose enhanced sentences based on consideration of prior convictions, which "does not constitute a second punishment for that offense." *Id.* (citing *United States v. Brazil,* 395 F. App'x 205, 222 (6th Cir. 2010)) (other citations omitted); *see also United*

*States v. Small*, 988 F.3d 241, 259 (6th Cir. 2021) (affirming a district court's consideration of related, uncharged conduct in imposing a sentence).

Here, Defendant's sexual battery and other abuses of UAC-1 highlight the seriousness and significant consequences of Defendant's lies, deception and abuse of a government program designed to protect children. Indeed, had Defendant, as a twenty-four-year-old male, truthfully disclosed to ORR that he had no familial relationship with a fourteen-year-old female minor whom he sought to sponsor, ORR policy would have required Defendant to submit both fingerprints for a background check and evidence of a bona fide social relationship with the child and/or the child's family. Instead, Defendant's lies allowed him to circumvent these requirements and ORR granted Defendant's application to sponsor UAC-1 with grave consequences.

The consequences of Defendant's encouraging and inducing, false statements, and aggravated identity theft were anything but innocuous. Defendant's crimes facilitated his abuse of UAC-1. Simply put, had Defendant told the truth to ORR, he likely would not have been granted sponsorship of UAC-1 and UAC-1 likely would have been spared from her suffering. The sentence this Court fashions should recognize these relevant circumstances.

## II.       DEFENDANT'S HISTORY AND CHARACTERISTICS

Defendant's criminal history is classified as Category II because he was sentenced in 2024 to an eight-year term of incarceration related to his conviction of two counts of felony sexual battery committed against UAC-1. Defendant's admitted illegal entry into the United States and repeated false assertions to ORR exhibit a pattern of dishonesty and a willingness to defraud the United States to obtain benefits without regard for the risks fraud poses to others, including children.

Moreover, the Defendant's conduct related to his sponsorship of UAC-1 does not reflect the full extent of Defendant's fraud against the UAC program, which potentially placed multiple other children at risk of Defendant's exploitation.  Specifically, as addressed in the Presentence Investigative Report (PSR), Defendant sought to sponsor four additional UACs after he sponsored UAC-1.  *See* PSR ¶¶ 18-20.  At least three of Defendant's additional sponsor applications were made using aliases.  *Id.*  Defendant supported the applications in which he used aliases with what appeared to ORR personnel to be legitimate government-issued identification documentation.  ORR approved at least one of those applications.  In each of his five sponsor applications, Defendant affixed his signature affirming the accuracy of his statements under the penalty of perjury.  This highly relevant conduct again shows Defendant's willingness to repeatedly provide ORR with false information that impedes the government's ability to safeguard children.

Further, specific and general deterrence is a particularly important consideration in this case.  The ORR UAC Program is the subject of rampant fraud, which, as this case so aptly demonstrates, can lead to devastating consequences that permanently harm particularly vulnerable children.  *See United States v. Nava-Martinez*, No. CRIM. B-13-441-1, 2013 WL 8844097, at *5 (S.D. Tex. Dec. 13, 2013) ("Some children are more vulnerable to exploitation, such as unaccompanied alien children") (citation omitted).  Defendants' crimes for encouraging and inducing, false statements and identity theft were pre-meditated and planned.  Such crimes are uniquely susceptible to general deterrence of would-be fraudsters.  *See, e.g., United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (finding that a sentence for white-collar crime must reflect the need for general deterrence because these crimes are "especially susceptible to general deterrence"); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic

9

and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV., 721, 724 (2005))).  The need to deter fraud in the UAC Program is apparent because the system can only adequately protect children when applicants are honest.  In those instances where perpetrators are caught, "one of the primary objectives of the sentence is to send a message to other[s] . . . that fraud is a serious crime that carries with it a correspondingly serious punishment." *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (noting this in the context of healthcare fraud).

Finally, there are no identifiable mitigating characteristics to justify a reduced sentence in this case.

## III.    SENTENCING RECOMMENDATION

Defendant's criminal history category and the combined offense level agreed to in the stipulated plea agreement correlate to an advisory guideline range of 15 to 21 months' imprisonment.  The government recommends that the Court impose a term of imprisonment of 21 months to reflect the particularly harmful nature of the offenses and Defendant's history and characteristics of abuse and dishonesty.  The circumstances of Defendant's offenses and personal history and characteristics necessitate a sentence at the high-end of the guidelines range.

Additionally, as the parties agreed in the stipulated plea agreement, the Court is required to impose a two-year mandatory term of imprisonment for the violation of Title 18, United States Code, Section 1028A ("Section 1028A"),  to be served consecutively with any other term of imprisonment.  Section 1028A mandates that Defendants convicted of aggravated identity theft

10

"shall, in addition to the punishment imposed for the [predicate felony offense], be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1).[5]

The parties, however, disagree concerning whether the mandatory two-year term of imprisonment may, in the court's discretion, run concurrent with the state sentence Defendant is currently serving. Controlling precedent is clear that courts are obligated to impose the mandatory two-year sentence consecutive to the state conviction. *See Gilbert v. United States,* 64 F.4th 763, 774-78 (6th Cir. 2023) (holding that courts lack the discretion to run Section 1028A's mandatory two-year sentence concurrent with a state sentence); *see also United States v. Usher*, 789 F. App'x 585, 586 (9th Cir. 2020) (reasoning that the appellant's sentences for violating Section 1028A must run concurrent with his state sentence and observing there is "no reason to exclude state sentences from the ambit of" Section 1028A's requirement to run the sentence consecutively); *see also United States v. Ward*, 793 F. App'x 629, 630 (9th Cir. 2020) (explaining that a district court "has no discretion" and "must run" an aggravated identity theft sentence consecutive to a state sentence). In reaching its holding, the Sixth Circuit in *Gilbert* observed that "Congress clearly 'meant what [it] said and said what [it] meant' in 18 U.S.C. § 1028A—that an aggravated identity theft sentence must run consecutive to all other sentences, including undischarged state sentences." *Gilbert*, 64 F.4th at 774 (citation omitted) (bracketed text in original).

As a result, the government recommends a total sentence of 45 months of incarceration to run consecutively to the state sentence he is currently serving for two counts of sexual battery,

---

[5] Section 1028A further provides that the sentence for the predicate offense may not be reduced "so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section." *Id*. § 1028A(b)(3).

followed by the maximum allowable three-year term of supervised released, the terms of which should reflect the danger he poses to children and his status as an alien without permission to reside or remain in the United States.  Such a sentence is necessary and no more than sufficient to account for Defendant's conduct.

## IV.    CONCLUSION

Defendant's conduct was egregious.  He abused an important government program designed to protect children.  Based on his lies, ORR granted him sponsorship, which enabled him to exploit UAC-1.  The Court should impose a significant term of imprisonment to reflect the seriousness of Defendant's conduct and to deter similar conduct.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

/s/ Carol Skutnik

Carol Skutnik (OH: 0059704)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3785
Carol.Skutnik@usdoj.gov

A. TYSEN DUVA
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

/s/ Christian A. Levesque

Christian A. Levesque (DC: 501778)
Acting Deputy Chief
Spencer M. Perry (CA: 350889)
Trial Attorney
Human Rights and Special Prosecutions
Section
1301 New York Ave NW, Suite 1200
Washington, D.C. 20530
(202) 538-2373

12